51 P.3d 979

Mike PUTZ & Pat Putz, husband and
wife, dba Northern Construction,
Petitioner Employer,

v.

The INDUSTRIAL COMMISSION
OF ARIZONA, Respondent,

Ernest Day, Respondent Employee,

Special Fund Division/No Insurance
Section, Respondent Party in
Interest.

No. 1 CA–IC 01–0103.

Court of Appeals of Arizona,
Division 1, Department C.

Aug. 15, 2002.

As Amended Aug. 26, 2002.

Jones & Miller By Kenton D. Jones, Prescott, Attorneys for Petitioner Employer.

Laura L. McGrory, Acting Chief Counsel, The Industrial Commission of Arizona, Phoenix, Attorney for Respondent.

Taylor & Associates, P.L.L.C. By Barbara J. Callaway, Phoenix, Attorneys for Respondent Employee.

The Industrial Commission of Arizona, Special Fund Division By Paula R. Eaton, Phoenix, Attorney for Respondent Party in Interest.

## OPINION

HALL, Judge.

¶ 1 In this special action, petitioner employer Mike and Pat Putz, husband and wife, dba Northern Construction, request that we set aside an Industrial Commission award for compensable claim. Northern Construction asserts that the Administrative Law Judge ("ALJ") erred in determining that it was an employer subject to Arizona's Workers' Compensation Act ("Act"), Ariz.Rev.Stat. ("A.R.S.") §§ 23–901 through –1091. Because we conclude that Northern Construction does not "regularly employ" any workers, *see* A.R.S. § 23–902(A) (1996), and is therefore not an employer covered by the Act, we set aside the award.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 Mike Putz ("Putz") is a licensed residential contractor who, doing business as Northern Construction, works in the home repair and construction trade. He gets work through an advertisement in the paper, doing a "[l]ittle bit of everything," including door, glass, and lock repair. The majority of the time he works alone, only hiring help as needed to assist him in tasks involving objects too heavy or too large for him to handle alone. He does his own bookkeeping and does not maintain a payroll or workers' compensation insurance. In 2000, Jeanette and Grenville French, then husband and wife and

joint business owners, hired Northern Construction to construct a forty-by-eighty-foot prefabricated metal building.

¶ 3 Ernest Day, a retired plastic welder who hires out and barters his labor, helped construct the building after Jeanette French informed him of the opportunity to earn $100 per day helping Putz. Day expected to work approximately four days. However, he fell from a ladder on September 28, 2000, his third day at the job site, sustaining multiple broken bones and a ruptured lung.

¶ 4 The No Insurance Section of the Commission's Special Fund Division denied Day's workers' compensation claim. *See* A.R.S. § 23–907(B) (2000). Day then requested a hearing at which six witnesses testified: Jeanette and Grenville French, Putz, Day, Jerry Dawson, and Ralph Clayton. The parties stipulated that the only issues to be determined at the hearing were whether Day was an "employee" under the Act and whether Northern Construction was an "employer" subject to the Act.

¶ 5 At the hearing, Putz denied having any regular employees or regularly hiring extra workers. Putz estimated that during the year preceding the administrative hearing, he hired or borrowed workers for a number of hours totaling approximately thirty-two eight-hour workdays ("workdays"). He did not know if or when he would need to hire extra labor again, and continued to work by himself.

¶ 6 Dawson, a carpenter who owns his own cabinetry business, testified that he also hires himself out occasionally to others, including the Frenches and Putz. He first met Putz when he helped Putz construct a kennel for Jeannette French contemporaneously with the building. After that, Putz used Dawson on two other projects requiring more than one person. On these four projects, Dawson worked hours equivalent to twenty workdays. On these same four projects, Putz used other workers, including Day, for a total of hours equivalent to four workdays. When Dawson worked for Putz,

---

1. We do not address Northern Construction's alternative argument that § 23–902(A) is unconstitutionally vague.

Dawson set his own schedule and rate of pay. He also worked other jobs and did not consider himself employed by Putz or Northern Construction.

¶ 7 The ALJ determined that the claim was compensable after finding both that Day was an employee under the Act and that Northern Construction was an employer subject to the Act. In support of his findings, the ALJ incorporated portions of Day's posthearing memorandum.

¶ 8 Northern Construction filed this special action, questioning only the ALJ's determination that it is an employer subject to the Act. We have jurisdiction pursuant to Arizona Rule of Procedure for Special Actions 10, and A.R.S. §§ 12–120.21(A)(2) (1992) and 23–951(A) (1995).

## DISCUSSION

### I. Standard of Review

 ¶ 9 We review de novo both questions of statutory interpretation, *Stulce v. Salt River Project Agric. Improvement & Power Dist.*, 197 Ariz. 87, 89, ¶ 3, 3 P.3d 1007, 1009 (App.1999), and conclusions of law such as whether an employer is subject to the Act, *see Special Fund Div./No Ins. Section v. Indus. Comm'n*, 172 Ariz. 319, 321, 836 P.2d 1029, 1031 (App.1992). To the extent that the issues raised present questions of fact, we defer to findings that are reasonably supported by the record. *Kaibab Indus. v. Indus. Comm'n*, 196 Ariz. 601, 605, ¶ 10, 2 P.3d 691, 695 (App.2000).

### II. "Regularly Employed"

 ¶ 10 Employers subject to the Act are:

[E]very person who has in his employ any workers or operatives regularly employed in the same business or establishment under contract of hire, except domestic servants. . . . For the purposes of this subsection "regularly employed" includes all

employments, whether continuous throughout the year, or for only a portion of the year, in the usual trade, business, profession or occupation of an employer.

§ 23–902(A).

¶ 11 In *Donahue v. Industrial Commission*, 178 Ariz. 173, 176–77, 871 P.2d 720, 723–24 (App.1993), this court considered whether the phrase "regularly employed" in § 23–902(A) is intended to subject to the Act all those who hire workers for tasks in the employer's usual trade or business, or only those who, in the normal or usual course of their business, hire others. We interpreted the phrase to mean the latter, which focuses on the employer's hiring practices, rather than the former, which focuses on the nature of the employee's duties. *Id.*

¶ 12 Our construction of § 23–902(A) in *Donahue* was based on policy considerations enunciated in *Marshall v. Industrial Commission*, 62 Ariz. 230, 156 P.2d 729 (1945), and subsequent cases interpreting § 23–902(A)'s predecessor statutes that defined "regularly employed" the same way. 178 Ariz. at 177–78, 871 P.2d at 724–25 (citing *Agee v. Indus. Comm'n*, 10 Ariz.App. 1, 3–5, 455 P.2d 288, 290–91 (1969), and *Modern Trailer Sales of Ariz., Inc. v. Indus. Comm'n*, 17 Ariz.App. 482, 485–86, 498 P.2d 556, 559–60 (1972)).[2] In *Marshall*, our supreme court looked to the employer's established business plan or mode of operation, 62 Ariz. at 235, 156 P.2d at 731, to determine whether "in the ordinary conduct of an employer's business he customarily or regularly employs the number [of employees] required to make the act applicable to him . . . ." *Id.* at 237, 156 P.2d at 732.

¶ 13 In *Modern Trailer*, this court, interpreting a former version of § 23–902(A), *supra* n. 2, considered whether short-term periodic employees should be counted among the three "regularly employed" employees required to trigger applicability of the Act. 17

**2.** *See* Arizona Code Ann. § 56–928 (1939) ("The term 'regularly employed,' as herein used, includes all employments, whether continuous throughout the year or for only a portion of the year, in the usual trade, business, profession or occupation of an employer.") *and* A.R.S. § 23–902(A) (1945) ("For the purposes of this section 'regularly employed' includes all employments, whether continuous throughout the year, or for only a portion of the year, in the usual trade, business, profession or occupation of an employer.").

Ariz.App. at 485, 498 P.2d at 559. We stated:

It is our opinion that where there is a scheme or plan or periodic need for extra short-term employees in the usual course of the business of the employer, then such extra short-term employees are to be counted in determining the presence of three or more employees regularly employed thus necessitating the securing of workmen's compensation insurance.

*Id.* at 486, 498 P.2d at 560. Modern Trailer was a corporate employer that maintained a payroll with two full-time employees and conducted its business, the purchase and sale of trailers, from a fixed location. *Id.* at 484, 498 P.2d at 558. The corporation also hired short-term labor up to twenty-five percent of the time "when [it] got new mobile homes in or vice versa" and for yard maintenance. *Id.* Based on those facts, we held that Modern Trailer's "scheme of employment required that it carry workmen's compensation coverage." *Id.* at 486, 498 P.2d at 560.

¶ 14 Relying on *Marshall*, we concluded in *Donahue* that "[t]he purpose of the 'regularly employed' requirement is to prevent an employer from oscillating between coverage and exemption as his labor force changes." 178 Ariz. at 177, 871 P.2d at 724. In interpreting the legislature's 1973 amendment to § 23–902(A), reducing from three to one the number of "regularly employed" workers necessary to bring an employer within the Act, we stated:

Retaining the "regularly employed" requirement reveals that the Legislature did not intend to require self-employed workers who work essentially alone to provide coverage for the rare instance in which they hire an occasional worker.

We conclude that section 23–902(A) renders an employer subject to the Act only when he employs at least one employee in the regular course of his business. If the employer ordinarily does not regularly em-

ploy any workers—if he hires only occasionally and unpredictably—he is not subject to the Act.

*Id.* at 179, 871 P.2d at 726. Because the employer's "infrequent and unpredictable" hiring practices did "not equate with having workers regularly employed," we held that he was not subject to the Act. *Id.*

¶ 15 Northern Construction argues that the ALJ erred by finding it to be an employer subject to the Act. The ALJ based his finding on Day's arguments that *Donahue* is factually distinguishable, that the "definitive factor" for determining the Act's applicability is the existence of "a scheme or plan or periodic need for extra short-term employees in the usual course of the business of the employer ...," *Modern Trailer,* 17 Ariz.App. at 486, 498 P.2d at 560, *quoted in Donahue,* 178 Ariz. at 178, 871 P.2d at 725, and that in the fall of 2000 Northern Construction hired workers twenty-five percent of the time, thereby making it an employer under *Modern Trailer.*

¶ 16 Day first argues that the present case is distinguishable from *Donahue.* He asserts that the nature of the work performed by O'Brien, the licensed contractor in *Donahue,* was that of a "handyman" and thus more limited in scope than that of Northern Construction, and that Northern Construction used other workers more times than O'Brien did. Although Northern Construction did use other workers more often than O'Brien, we do not find any significant differences in the nature or scope of the work performed by O'Brien and Northern Construction.[3]

¶ 17 Day also contends that Northern Construction hired workers twenty-five percent of the time during "the last four months of 2000," which he asserts is directly analogous to Modern Trailer's hiring of workers up to twenty-five percent of the time. Thus, according to Day, *Modern Trailer* requires a

---

3. Donahue fell from a ladder while working as a day laborer for William O'Brien, a licensed general contractor who did not carry workers' compensation insurance. O'Brien was a handyman who occasionally subcontracted work to others, but predominantly worked alone without any regular employees. Over the previous five years, he had hired casual laborers a couple of times a year for two to three days at a time. O'Brien had offered Donahue $50 per day for his help building two ramadas for a school and did not intend to use Donahue after they completed the ramadas. 178 Ariz. at 175, 871 P.2d at 722.

finding that Northern Construction is an employer subject to the Act. We disagree.

■ ¶18 Day improperly compares Modern Trailer's and Northern Construction's use of short-term labor over dissimilar time periods. Modern Trailer estimated its use of additional labor over the life of its corporate existence, which was seven months at the time of the injury. *Modern Trailer,* 17 Ariz. App. at 485, 498 P.2d at 559. Day bases his contention on testimony regarding projects undertaken by Northern Construction during the last four months of 2000, which includes the three months following his injury and involves a period of time when Northern Construction disproportionately relied on extra labor.[4] Thus, we reject, as unsupported by the evidence and case law, the ALJ's incorporation of Day's assertion that "in the relevant period of time, Northern Construction hired workers about 25% of the time."

■ ¶19 There is a more fundamental reason, however, why we disagree with Day's approach for resolving whether an employer is subject to the Act by merely calculating and comparing percentages. The purpose of the "regularly employed" requirement—to provide employers and employees stability in knowing when an employer is subject to the Act—is not served by such a formulaic approach. While relative percentages may be one indicium useful in distinguishing one employer's ordinary scheme or plan of employment from that of another, such a comparison does not, in and of itself, determine the Act's applicability to an employer.

¶20 Instead, to resolve where this case falls on the continuum between *Donahue* (employer not subject to the Act) and *Modern Trailer* (employer subject to the Act), we return to the determinative question asked in *Marshall:* Did Putz customarily or regularly employ at least one worker or was his hiring of extra labor only occasional and unpredictable?

¶21 In answering this question, we find the facts of *Modern Trailer* inapposite. Northern Construction's hiring of short-term labor was not dictated by an employment plan or mode of operation like that put into effect at Modern Trailer. The nature of Modern Trailer's business, buying and selling trailers, necessitated the cleaning and transportation of trailers intermittently but predictably. Operating from a fixed location, Modern Trailer also predictably required yard maintenance. Thus, in the ordinary conduct of its business, Modern Trailer knew that on an ongoing and regular—though intermittent—basis it would require additional labor up to twenty-five percent of the time. Considering the nature of Modern Trailer's business, its customary or regular use of short-term employees constituted an established mode of operation that made it subject to the Act.

¶22 By contrast, in the ordinary conduct of Northern Construction's business, the need for short-term labor arises far less predictably because the work is varied, unpredictable, and dictated by customers' demands and assignments. Most of Northern Construction's projects require only Putz's labor. As shown by the evidence, Northern Construction may have projects over a four-month period requiring twenty-four days of extra labor, yet perform work during the remaining eight months of the year requiring only eight days of extra labor. Putz testified that he did not know when Northern Construction would next need extra labor. From the record, we cannot detect a hiring plan that is anything but occasional and unpredictable.

¶23 Conversely, if, in the ordinary progression of its business, Northern Construction begins to consistently undertake projects requiring the use of other workers on a more regular or predictable basis, then it would become subject to the Act and required to purchase workers' compensation insurance. *See* A.R.S. § 23–902(A).

■ ¶24 When considering the facts of this case, we have been mindful of our duty to liberally construe the Act to effect its purpose of having industry bear its share of

---

4. Putz estimated that Northern Construction used other workers for a total of thirty-two days in the year preceding the hearing. Other testimony shows that twenty-four of these days were during the last four months of 2000.

the burden of human injury as a cost of doing business. *Ocean Accident & Guar. Corp. v. Indus. Comm'n,* 32 Ariz. 265, 271–72, 257 P. 641, 643 (1927). But, a "liberal construction is not synonymous with a generous interpretation." *Nicholson v. Indus. Comm'n,* 76 Ariz. 105, 109, 259 P.2d 547, 549 (1953). The court may "not impose burdens and liabilities which are not within the terms or spirit" of the Act. *Bergstresser v. Indus. Comm'n,* 13 Ariz.App. 91, 93, 474 P.2d 450, 452 (1970).

¶ 25 As this case demonstrates, no bright-line rule exists notifying self-employed employers when they become subject to the Act. The analysis required by *Marshall* and subsequent cases interpreting § 23–902(A) calls for occasional case-by-case determinations when the facts regarding the use of extra short-term labor are close. Thus, there is risk involved when those who are self-employed hire others without purchasing workers' compensation insurance. Obviously, employers who avail themselves of the Act obtain the protections inherent in it. *See* A.R.S. §§ 23–906(A) (1995) and –1022(A)

(1995). Those who elect to remain outside the Act must accept the attendant risks. *See* A.R.S. §§ 23–907 and –1022.

## CONCLUSION

¶ 26 Because Northern Construction does not "regularly employ" any workers, it is not an employer subject to the Act. Thus, neither Northern Construction nor the Special Fund Division has any obligation or liability for benefits under the Act. *See* A.R.S. § 23–907(B). The award is set aside.

CONCURRING: SUSAN A. EHRLICH, Presiding Judge, and DANIEL A. BARKER, Judge.